**JARROW v. CITY OF NEW ORLEANS**

(January 21, 1929. Opinion and Decree.)

Prentice E. Edrington, Jr., of New Orleans, attorney for plaintiff, appellant.

McCloskey & Benedict, of New Orleans, attorneys for defendant, appellee.

JANVIER, J. Plaintiff, a negro laborer, was run over by a locomotive and tender of the Public Belt Railroad of New Orleans at a point just below Harmony street, on March 31, 1925. One of his legs was cut off by the wheels, and the other was so badly crushed that it was amputated by the surgeons at the hospital.

Such injuries sustained by a laboring man, depending upon his daily manual toil for a livelihood, arouse our deepest sympathy.

The accident occurred about ten or fifteen minutes before the noon hour. In

order to understand how and where the unfortunate accident happened, one must be given a full description of the tracks, buildings, street crossings, and other surroundings.

The Harmony street wharf, on its land side, has a concrete platform about level with the floor of freight cars. Immediately adjacent to this platform is a track commonly called the "house track." Parallel to this house track, about 55 feet from it, there is another track. There is a crossover track which connects these two tracks. This crossover track joins the house track at a point a few feet on the upper side of Harmony street, and connects with the parallel track at a point approximately 75 feet on the lower side of Ninth street. This crossover track is straight from end to end. There are six or seven other tracks parallel to the first two mentioned, but except insofar as their existence tends to show that the whole locus is a network of tracks and hence a point at which pedestrians should be extremely cautious, these other tracks have no bearing on this case.

There was a string of freight cars on the house track immediately adjacent to the concrete platform. The upper end of this string of cars was some 40 or 50 feet below Harmony street. The evidence leaves us uncertain as to where the lower end of this string of box cars was, but it is certain that there were at least ten or twelve cars in the string.

Between the two parallel tracks, at a point about 100 feet or so below Ninth street, there is a building known as "the garbage dump," and in this building there was a toilet which, while probably not intended for public use, was, as a matter of fact, apparently used by the general public.

Plaintiff, just prior to the accident, was engaged with other longshoremen in unloading the first car on the upper end of the string of cars to which we have referred.

He testifies that it became necessary for him to seek a toilet, and that he stepped from the car in which he was working to the platform, but that instead of turning to the left in a down-river direction, he turned to the right and walked to the up-river or Harmony street end of the car in which he was working; that he then got to the ground and walked over to the crossover track, and, on reaching it, turned to his right and walked along the center of this crossover track in a down-river direction to go to the toilet in the garbage dump. If he did take this route, he had been walking some 200 or 250 feet when he was run down from the rear by the tender of a switch engine going in the direction in which he was walking. Defendant suggests, though no witness so testifies, that he had not taken the route he describes, but had in fact walked a short distance along the concrete platform in a down-river direction and had then crossed between two of the box cars in the string and had jumped to the ground, and that this jump occurred just as the tender and locomotive reached the point at which he landed; or, in other words, that he jumped to the ground just in front of the on-coming tender. This is suggested as the only way in which he could have gotten in front of the locomotive without being seen. It is indeed strange that he was not seen, if in truth he had been walking on the track for some 200 or more feet, because not less than four members of the crew of the locomotive claim to have looked in the direction in which he would have been and none of them saw him. Conceding that

some of these employees may not have been looking, it seems hardly probable that all four were mistaken in this regard. To look in the direction in which one is going is instinctive, and, as this locomotive and tender were proceeding down this track, and as four members of the crew were interested in the safe operation of the locomotive, it seems highly probable that at least one of them was actually looking in the direction towards which instinct would ordinarily have turned his view.

Plaintiff concedes that the facts of this case are strikingly similar to those set forth in the case of Harrison vs. Louisiana Western Railway, 132 La. 761, 61 So. 782, and Mrs. Abbie Castile vs. J. D. O'Keefe, 138 La. 479, 70 So. 481, but strenuously urges a clear differentiation, in that here the accident happened within the limits of a large city and in a place in which a member of the general public had a right to be, to-wit: the bank of the Mississippi river. He cites Civil Code, art. 455: "The use of the banks of navigable rivers or streams is public. * * *" He contends, in effect, that this article gave to him the right to be where he was, and that this right was co-extensive with the right of the locomotive, and that, as the accidents in the two cases cited happened on the private rights of way of the respective defendants, the plaintiffs were trespassers, and that those cases are thus distinguishable from this. We do not see this distinction.

It is true that here, possibly, defendant did not have the right to exclude plaintiff or any member of the general public, but the trouble here is not that plaintiff had no right to be where he was, but that, even if he had that right, in the exercise of it, he did not display due care for his own safety. The two cases

mentioned held that a person remaining on a railroad track is guilty of continuing negligence so long as he remains there. If, then, it is negligence to remain on a railroad track, we cannot see any difference between the city and the country, nor between a private right of way which the railroad owns and a public right of way which the railroad has a right to use. The fact that the location was more or less used by the public may, it is true, place a greater duty on the train crew; this was true also in both the cases cited. But surely the fact that trains were constantly switching over this track likewise placed a greater duty on plaintiff, and the absence of right in plaintiff to recover is based, not on the fact that defendant was not negligent, but on the fact that his own negligence contributed proximately to the accident. That this track was in constant use by switch engines is testified to by all of plaintiff's witnesses. For instance, Joe Henry says: "They are always switching at that hour of the day."

That there is no distinction in principle between accidents of this kind happening in the open country and happening in the city limits is shown by the decision of the Supreme Court in Nolan vs. Illinois Central Railroad Co., 145 La. 483, 82 So. 590. The accident in the Nolan case occurred in the city of New Orleans near Washington street. In the syllabus appears this language:

"Railroad cannot be held liable for injuries to one on the track upon doctrine of last clear chance, where its negligence and that of person injured were concurrent and continued up to the moment of the accident."

The law, in our judgment, seems to be plain that, regardless of the negligence of the crew of the locomotive, a person having the full use of his senses, and remain-

ing on a railroad track, is guilty of continuing negligence, and that this negligence extends to the very moment of the accident and prevents the application of the doctrine of the last clear chance.

Since we are of the opinion that, even accepting plaintiff's statement as true, his own negligence bars recovery, we deem it unnecessary to analyze at length the various conflicting statements of the witnesses, nor would it serve any good purpose to discuss the law applicable to one who chooses a dangerous route when a safe one is available. In passing, let us remark that it seems there was a much safer route along the concrete platform to Ninth street, and then at right angles across one track, and that there was also a safer route, had plaintiff desired to walk in the direction which he did, between the tracks of two of the lines of railway instead of between the rails of one.

Let us concede that the train crew were not looking out. Is plaintiff's case bettered by this concession? We think not. As the court said in the Harrison case:

"This failure on the part of the engineer to look ahead was culpable negligence. Especially that this place was much used by pedestrians, there being no other way along there, and he must have known this, and the defendant company was also culpably negligent in the excessive speed of the train which was going at some 30 or more miles an hour, although by ordinance of the city the speed of trains within the city limits was restricted to 15 miles an hour."

For these reasons, the judgment appealed from is affirmed, at the cost of appellant.